IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:CR-06-009** |
| | : | |
| **v.** | : | |
| | : | |
| **JESSE KENLEY** | : | |

## M E M O R A N D U M

Before the court is Defendant's motion to withdraw his guilty plea (Doc. 25).[1]  On May 15, 2006, the court held an initial hearing with respect to Defendant's motion, and on June 14, 2006, the court held a subsequent hearing. (*See* Doc. 27.)  Following the June 14, 2006 hearing, the court provided Defendant an opportunity to submit a brief and the Government an opportunity to file a responsive brief for the limited purpose of addressing Defendant's statute of limitations argument.  (*See* Doc. 45.)  The parties have now fully addressed Defendant's motion, and the matter is ripe for disposition.  For the reasons that follow, the court will deny Defendant's motion.

## I.      Background

### A.      Procedural History

On January 4, 2006, Defendant entered a guilty plea to a three-count indictment.  Defendant was scheduled to be sentenced on May 15, 2006.  On May 10, 2006, Defendant filed the instant motion to withdraw his guilty plea (Doc. 25).

---

[1]The court notes that Defendant filed four motions *pro se*.  Specifically, Defendant filed a motion to quash the proffer agreement (Doc. 10), a motion to withdraw his guilty plea (Doc. 13), a motion to quash the plea agreement (Doc. 39), and a subsequent motion to quash the proffer agreement and any statements made by Defendant (Doc. 41).  The court, noting that Defendant was at all times represented by counsel, struck said motions.  (Docs. 17, 12, 44.)

Thereafter, the court held a hearing with respect to Defendant's motion on May 15, 2006. During the May 15, 2006 hearing, after Defendant called into question the conduct and advice of his attorney, Thomas Thornton,[2] as well as the content of the proffer sessions, it became apparent that it would be necessary and proper for the Government to call Mr. Thornton as a witness. The court scheduled a subsequent hearing, terminated Mr. Thornton as Defendant's counsel, and provided Defendant with new counsel. (Doc. 27.) The subsequent hearing was held on June 14, 2006.

### B.   Factual History

#### 1.   The March 8, 1992 Robbery and Murder at the Red Roof Inn and the Subsequent Investigation

On March 8, 1992, the Red Roof Inn on Eisenhower Boulevard, Swatara Township, Pennsylvania, was robbed and Red Roof Inn clerk Sue Behrens was murdered. (Doc. 18, Guilty Plea Hr'g Tr. 16, Jan. 4, 2006.)[3] An autopsy of Mrs. Behrens revealed that she died as a result of multiple cuts and stab wounds from a knife. (*Id*.)

Defendant quickly became a person of interest in the robbery and murder. (*Id*. at 17.) Defendant, who had been an employee of the Red Roof Inn, was observed with cuts on his hands following the March 8, 1992 incident. (*Id*.) When questioned by the police, Defendant denied involvement in the incident. (*Id*.) However, from time to time, over the course of the following decade, police

---

[2]Mr. Thornton was appointed counsel from the Federal Public Defender's Office.

[3]A great deal of the information provided during the guilty plea hearing and as part of the guilty plea arose from a proffer that Defendant provided to federal agents on May 17, 2004. (*See* Gov. Ex. 1.) The court will fully address the issues relating to the proffer agreement and the use of the proffer below.

received information that Defendant and another individual, Tyrone Poole,[4] had made admissions of their involvement in the events of March 8, 1992. (*Id.*)

### 2. The Grand Jury Investigation, Charges Brought Against Defendant in Dauphin County, and the Alleged Witness Tampering

In September 2001, a federal grand jury began investigating the matter and compelled the testimony of several witnesses who confirmed Defendant's involvement in the March 8, 1992 incident. (*Id.*) As part of the federal grand jury investigation, Defendant's former wife, Alisha Kenley, was subpoenaed to appear before the grand jury on April 7, 2004. (*Id.*) Alisha Kenley had previously told investigators that she knew nothing about Defendant's involvement in the March 8, 1992 events. (*Id.*) However, on April 7, 2004, while meeting with investigators prior to going into the grand jury, she admitted that she had such knowledge. (*Id.*) Specifically, Alisha Kenley told investigators that Defendant came to the house where they lived in Oberlin, Pennsylvania in the early morning hours of March 9, 1992 and knocked on the bedroom window to be let in. (*Id.* at 18.) Alisha Kenley said that Defendant had blood on his hands and clothing. (*Id.*) She also said that he showered once inside the house and burned the clothing and a bloody towel in the fireplace in the basement area of their home and that the towel had contained a knife, which she described as being a kitchen-type knife that was also bloody. (*Id.*) Alisha Kenley admitted to putting the knife in the trunk of a vehicle, and within a few days, of disposing that weapon in a dumpster outside of a restaurant in Highspire, Pennsylvania. (*Id.*)

Based upon the information provided at the grand jury hearings, it was determined that there was enough evidence to arrest Defendant for his involvement

---

[4]Tyrone Poole pled guilty to a violation of 18 U.S.C. § 4, misprision of felony. *United States v. Poole*, No. 04-0020 (M.D. Pa. March 23, 2006) (judgment).

in the March 8, 1992 incident.  (*Id.*)  The charges were brought in Dauphin County.
Sometime thereafter, the Dauphin County District Attorney indicated that Dauphin
County intended to seek the death penalty or in the alternative a felony murder
charge carrying a life sentence.

Following his arrest, Defendant placed a call to Alisha Kenley from the
Dauphin County Prison.  (*Id.* at 19.)  These calls were recorded.  (*Id.*)  During one
conversation, Defendant told Alisha Kenley to tell investigators that she had made
up her testimony before the grand jury.  (*Id.*)[5]

### 3.   The Proffer Agreement and the Subsequent Proffer Sessions

On May 17, 2004, Defendant, along with Mr. Thornton, made a proffer
to federal agents.  (*See* Gov. Ex. 1.)  The proffer agreement provided that

> no statements made by [Defendant] during the
> proffer/discussion will be used against him in the
> Government's case-in-chief should [Defendant] be
> indicted on charges related to the subject matter of the
> proffer/discussion.  However, the Government may make
> derivative use of and may pursue any investigative leads
> suggested by any statements made by him.

(Def. Ex. 2 at p. 1.)  The proffer agreement also provided that "in the event that
[Defendant] is a witness at any trial and offers testimony materially different from
any statements made during the proffer/discussion, the attorney for the Government
may cross-examine him and use said statements."  (*Id.* at 2.)

During the May 17, 2004 proffer session, Defendant admitted his
involvement in the planning and execution of the robbery; however, Defendant
continued to assert his innocence with respect to the murder of Mrs. Behrens.
(Gov't Ex. 1.)  Defendant stated that Mr. Poole had committed the murder while

---

[5]At the time of Defendant's guilty plea, the investigation into the witness tampering was
ongoing; however, at that time, the court found that there was enough evidence to accept Defendant's
guilty plea with respect to the charge of witness tampering.

Defendant was not in the room.  (*Id*.)  According to Defendant's proffer, when he entered the room where Mrs. Behrens and Mr. Poole were, Mr Poole was in the process of stabbing Mrs. Behrens.  (*Id*. at 2.)  Defendant asserted that he grabbed Mr. Poole and took the knife away from him.  (*Id*.)  Defendant asserted that he suffered cuts on his hands during the course of taking the knife from Mr. Poole.  (*Id*.)

A second proffer session was held on May 27, 2004.  (*See* Gov't Ex. 2.)  During the May 27, 2004 proffer session, Defendant was questioned about some additional details related to the March 8, 1992 incident.  (*Id*.)  Additionally, Defendant was informed that he was going to be subjected to a polygraph test in the future with respect to his repeated assertions that he did not commit the murder.[6]  (*Id*.)

## 4.   <u>Subsequent Federal Plea Negotiations</u>

According to testimony provided at the May 15, 2006 and June 14, 2006 hearings by Mr. Thornton and Defendant's Dauphin County Public Defender, Paul Muller, during December 2005, there were conversations between United States Assistant Attorney William Behe, the Dauphin County District Attorney, Defendant, and his counsel, with respect to a federal plea agreement.  According to Mr. Thornton and Mr. Muller, the Government initially offered Defendant a plea agreement that included a forty-year sentence recommendation and an agreement to nol-pros the pending charges in Dauphin County in return for Defendant's guilty plea to charges under 18 U.S.C. § 1951 (Hobbs Act robbery), 18 U.S.C. § 371 (criminal conspiracy), and 18 U.S.C. § 1512 (witness tampering).  According to Mr. Muller, Defendant asked him to counter with a request for a twenty-year sentence

---

[6]Although Mr. Thornton did not go into specific detail, he testified that Defendant did not pass the polygraph test.

recommendation.  That request was denied.  Following additional negotiations, the Government tentatively offered a plea agreement that provided Defendant with a thirty-year sentence recommendation.  However, according to Mr. Muller, the Dauphin County District Attorney was unwilling to agree to a thirty-year recommendation.

On January 4, 2006, jury selection in Defendant's Dauphin County trial was slated to begin, although trial was not slated to begin until the following month. At that point, all of the jurors had returned questionnaires and defense counsel had had an opportunity to review the jury pool.  According to testimony by Mr. Muller and Defendant, Mr. Muller informed Defendant that the jury pool did not appear to be favorable to Defendant.

At some point before the members of the jury pool were brought into the courtroom, the Government offered Defendant a plea agreement that retained all of the original provisions with the exception that it provided for a thirty-five-year sentence recommendation.  According to Defendant's testimony, the plea agreement was conditioned as a final offer that he had to accept before the jury pool entered the courtroom or the plea agreement would be withdrawn.  Defendant asserted that he had approximately two minutes to decide whether he wanted to accept the plea agreement.

Mr. Thornton's June 14, 2006 testimony indicates a significantly different time-line than Defendant's.  According to Mr. Thornton, he was called on the morning of January 4, 2006, told that a subsequent plea agreement was being offered to Defendant, and asked to participate as Defendant's counsel.  Mr. Thornton testified that he arrived at the courthouse approximately one hour later. Mr. Thornton stated that he went over the plea agreement with Defendant and Defendant's Dauphin County public defenders for approximately one and half

6

hours.  During that time, Mr. Thornton testified that he read over the entire plea agreement with Defendant and explained in detail the consequences of accepting the plea agreement.

Mr. Thornton testified that he strongly recommended Defendant accept the plea agreement because Defendant was facing capital murder charges in his Dauphin County case and because he had heard Defendant admit responsibility for the robbery, even though Defendant denied responsibility for the murder.  Mr. Muller testified that he similarly encouraged Defendant to accept the plea agreement because under the circumstances he could still be convicted of a felony murder (murder occurring in the course of a robbery).

### 5.      The Plea Agreement and the Guilty Plea Hearing

At some point after meeting with Mr. Thornton, Defendant decided to accept the plea agreement.  Defendant then appeared before Dauphin County Judge Lewis and informed Judge Lewis that he intended to accept the Government's plea agreement. (Doc. 18, Guilty Plea Hr'g Tr. 9, Jan. 4, 2006.)  Judge Lewis conducted a brief colloquy.  (*Id.*)  Thereafter, Defendant was transferred to the federal courthouse for the Middle District of Pennsylvania.  Later that day, Defendant entered his guilty plea before the undersigned Judge.

During the Defendant's guilty plea, Defendant was represented by Mr. Thornton.  Mr. Thornton said that he gave the Government permission to utilize the statements made in Defendant's two proffer sessions to form the basis of the information in the plea agreement.  At the guilty plea hearing, Defendant waived the reading of the Information; however, Defendant asserted that he had gone over the Information with Mr. Thornton prior to the guilty plea hearing.  (*Id.* at 4.)  At no time during his guilty plea hearing did Defendant object to the use of information obtained through his proffer sessions.  (*Id.*)

7

During the guilty plea hearing the court informed Defendant of the rights that he was giving up by pleading guilty. Specifically, the court informed Defendant that he was giving up his right to a jury trial, his right to present any defenses, his right to appeal any pretrial motions, and his right to appeal the imposition of the sentence imposed. (*Id*. at 4-5, 12.) Defendant was informed that the recommended sentence was thirty-five years, and that while the court could not impose a sentence higher than thirty-five years, it retained the ability to impose a lower sentence. (*Id*. at 9-13.) Furthermore, Defendant was informed that while he was giving up his right to appeal any sentence imposed, the Government could appeal any sentence imposed. (*Id*. at 13.) Additionally, the court confirmed through a series of questions that Defendant's plea was voluntary. (*Id*. at 3-4, 9.) The Government read into the record the information supporting the charges brought against Defendant. (*Id*. at 14-19.) Subsequently, Defendant entered his guilty plea. (*Id*. 19-21; Doc. 6.)

## II.        **Legal Standard**

"If a motion for withdrawal of a plea of guilty or nolo contendere is made before a sentence is imposed . . . the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason." *United States v. Martinez*, 785 F.2d 111, 114 (3d Cir.1986). However, "withdrawal of a guilty plea is not an absolute right." *United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005) (citations omitted). There are three primary factors that a court must look to in evaluating a motion to withdraw a guilty plea: "(1) whether the defendant asserts his innocence; (2) the strength of the defendant's reasons for withdrawing the plea; and (3) whether the [G]overnment would be prejudiced by the withdrawal." *United States. v. Jones*, 336 F.3d 245, 252 (3d Cir. 2003). "[T]he Government is not

8

required to show prejudice when a defendant has shown no sufficient grounds for permitting withdrawal of a plea." *Martinez*, 785 F.2d at 116 (quoting *United States v. Saft*, 558 F.2d 1073, 1083 (2d Cir. 1977)).  Finally, "[a] shift in defense tactics, a change of mind, or the fear of punishment are not adequate reasons to impose on the government the expense, difficulty, and risk of trying a defendant who has already acknowledged his guilt by pleading guilty." *United States v. Brown*, 250 F.3d 811, 815 (3d Cir. 2001) (quoting *United States v. Jones*, 979 F.2d 317, 318 (3d Cir. 1992)).

**III.       Discussion**

During the May 15, 2006 and June 14, 2006 hearings Defendant asserted numerous reasons why he should be allowed to withdraw his guilty plea. Some of those reasons included: 1) that he is innocent of the charges to which he pled guilty; 2) that his Dauphin County counsel had failed to pursue alibi witnesses, to pursue leads of witnesses who implicated other individuals in the crime, and to follow up on possible DNA evidence; 3) that Mr. Thornton had misrepresented the actual sentence that he would receive; 4) that Mr. Thornton had allowed the Government to utilize the proffer sessions in forming the information of the plea agreement; 5) that Mr. Thornton, his Dauphin County counsel, and the Government had effectively coerced him into pleading guilty; 6) that Mr. Thornton had indicated that he should plead guilty to crimes that he did not commit; and 7) that at the time he entered his guilty plea the applicable statutes of limitations had elapsed for the Hobbs Act robbery and conspiracy charges, thus effectively voiding the guilty plea. The court will address the statute of limitations issues first.

### A.   Statute of Limitations

Defendant argues that with respect to the charges brought under 18 U.S.C. § 1951 (Hobbs Act robbery) and 18 U.S.C. § 371 (criminal conspiracy) that the applicable statutes of limitations had run before the indictment was brought against Defendant.  Thus, according to Defendant those charges cannot be maintained against him.  Defendant is mistaken.

"[T]he statute of limitations is an affirmative defense that is waived unless properly preserved."  *United States v. Jake*, 281 F.3d 123, 129 (3d Cir. 2002) (citations omitted); *see also United States v. Karlin*, 785 F.2d 90, 92-93 (3d Cir. 1993) ("[I]n criminal cases the statute of limitations does not go to the jurisdiction of the court but is an affirmative defense. . . ."); *Woodward v. United States,* 426 F.2d 959, 964 (3d Cir. 1970) ("A plea of guilty waives all non-jurisdictional defenses, whether these defenses be later raised in a § 2255 petition or a Rule 32(d) motion."); *Abram v. United States*, 398 F.2d 350 (3d Cir. 1968) (citations omitted) ("Having found the plea of guilty to have been voluntarily entered this constitutes a waiver of all nonjurisdictional defects and defenses.").

Defendant concedes the law cited above is the law in this circuit.  He argues, however, that because his guilty plea took place within a short time after a plea agreement was arrived at between the parties, he was deprived of the opportunity to file a pretrial motion pursuant to Federal Rule of Criminal Procedure 12(b) in order to raise the statutes of limitations as to Counts I and II.  This argument makes no sense.

Defendant and the Government entered into a bargain.  Defendant agreed to plead to a felony Information containing Counts I and II in exchange for a thirty-five-year sentence recommendation and the county's dropping the murder charge.  To now say he was deprived of raising the statutes of limitations defenses as

10

to the bargained-for charges is incongruous.  As discussed in greater detail below, Defendant made a knowing, intelligent, and voluntary plea agreement.

Accordingly, Defendant has waived the statutes of limitations defenses to Counts I and II.  Defendant's motion will be denied with respect to this argument.

## B. **Defendant's Remaining Arguments**

### 1. **Attorney-Client Privilege**

As noted, Mr. Thornton, who was Defendant's federal public defender, and Mr. Muller, who was Defendant's Dauphin County public defender, testified at the June 14, 2006 hearing.  Before the court may consider the testimony of Mr. Thornton and Mr. Muller, the court must first determine whether such consideration is proper.

Although communications between counsel and the defendant are usually protected by the attorney-client privilege, there are certain circumstances that pierce the veil of secrecy.  As provided by the Third Circuit, the attorney-client privilege can be waived when a party asserts claims or defenses that put his attorney's advice or conduct in issue.  *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir. 1994).  "The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id*. (citations omitted); *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."); *GAB Bus. Servs., Inc. v. Syndicate 627*, 809 F.2d 755, 762 (11th Cir. 1987) (stating that a party "waives its attorney-client privilege when it injects into this litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of

its attorneys' conduct"); *Armstrong v. United States*, 440 F.2d 658, 659 (5th Cir. 1971) ("[W]here one attempts to attack a guilty plea in a federal court . . . and offers testimony during the litigation as to conversations with counsel regarding the entry of the guilty plea, he waives the right to claim the attorney-client privilege as to entire scope of that issue.").

Thus, the court must look to Defendant's assertions to determine whether he has placed counsel's advice or conduct in issue.

### a.     Mr. Thornton's Testimony

Defendant alleges that he was coerced into accepting the plea agreement.  During the May 15, 2006 and June 14, 2006 hearings, Defendant asserted that Mr. Thornton repeatedly encouraged Defendant to accept the plea agreement and to plead guilty to charges he was innocent of.  Specifically, Defendant asserts that Mr. Thornton told Defendant to plead guilty to the charges of Hobbs Act robbery and criminal conspiracy, even though Defendant told Mr. Thornton that he was not guilty of these charges.  Thus, Defendant squarely placed communications he had with Mr. Thornton and the advice of Mr. Thornton in issue. "[B]y placing the advice in issue, [Defendant] has opened to examination facts relating to that advice." *Rhone-Poulenc Rorer Inc.,* 32 F.3d at 863.

At the June 14, 2006 hearing, Mr. Thornton testified that Defendant had admitted his guilt with respect to the robbery; however, that Defendant continued to assert his innocence with respect to any involvement in the murder.  Mr. Thornton testified that he strongly believed that it was in Defendant's best interest to enter into the plea agreement offered by the Government considering the fact that Defendant, despite his assertions, was facing a possible death sentence for the murder or life sentence for the felony murder charge, coupled with the weight of evidence against Defendant.

As noted, Mr. Thornton's testimony also contradicted Defendant's testimony with respect to the amount of time that Mr. Thornton spent with Defendant and the amount of time that Defendant had prior to accepting the plea agreement. Mr. Thornton testified that he read over the entire guilty plea with Defendant, explaining in detail what rights Defendant was giving up and other implications of accepting the plea agreement.

Thus, according to Mr. Thornton's testimony, Defendant had informed Mr. Thornton of his guilt with respect to the robbery months prior to entering into the plea agreement, Mr. Thornton spent ample time with Defendant explaining the contours of the plea agreement, and Defendant had sufficient time and information to make an informed decision with respect to the plea agreement.

### b.     Mr. Muller's Testimony

Defendant asserted that Mr. Muller, along with co-counsel, failed to examine DNA evidence, to follow potential witness leads, and to pursue potential alibi witnesses. Thus, Defendant has called into question the conduct of Mr. Muller as counsel, and the court finds that it is proper to consider testimony by Mr. Muller with respect to Defendant's allegations.

Like Mr. Thornton, Mr. Muller also testified that Defendant asserted that he was involved in the robbery, although he maintained his innocence with respect to the murder. It is well established that an attorney has an ethical obligation not to present a witness at trial who will commit perjury. Therefore, Mr. Muller, having been informed by Defendant of his guilt with respect to the robbery, was ethically precluded from presenting witnesses who would have placed the Defendant somewhere other than the Red Roof Inn on March 8, 1992, or placed the guilt on someone other than the Defendant for the robbery.

With respect to the DNA evidence, Mr. Muller testified that the DNA evidence obtained by the police was determined to be inconclusive due to the fact that the victim's blood had contaminated the crime scene. Mr. Muller asserted that he intended to rely on the inconclusiveness of the DNA evidence as a defense strategy. Mr. Muller also testified that he declined to do any further DNA investigation because he feared that further DNA investigation might possibly result in Defendant's DNA being found, and thereby further implicate Defendant in the murder.

Mr. Muller's testimony contradicts Defendant's assertions of innocence with respect to the robbery. Additionally, Mr. Muller's testimony contradicts Defendant's assertion that Mr. Muller's conduct was somehow ineffective.

### 2.      Use of Statements Made During the Proffer Sessions

Having determined that the use of Mr. Thornton's and Mr. Muller's testimony is proper, the court now turns to the use of the information obtained during the proffer sessions. As noted, the proffer session agreement contained a provision that precluded its use unless Defendant testified differently at trial. However, as the Government notes, the proffer agreement contained no language placing limitations on how the information could be used outside of the context of a trial of the Defendant. (Doc. 50, Gov't Resp. Br. 2.)

Moreover, Mr. Thornton testified that he gave the Government permission to use the information contained in the proffer agreement to form the basis of the information contained in the guilty plea agreement.[7] Mr. Thornton

---

[7]The charges contained in the plea agreement were Hobbs Act robbery, criminal conspiracy, and witness tampering. The plea agreement was contingent upon Defendant's pleading guilty to all three charges. This information was necessary in order for the court to determine if there were factual bases for the guilty pleas. It was a logical decision on the part of Mr. Thornton to not subject his client to

(continued...)

asserted that he did so in order to protect his client from facing the death penalty in the Dauphin County trial.  Mr. Thornton also testified that he reviewed the Information with Defendant.  At the guilty plea hearing, Defendant was asked if Mr. Thornton had gone over the Information with him, and Defendant responded that Mr. Thornton had.  (Doc. 18, Guilty Plea Hr'g Tr. 4, Jan. 4, 2006.)  Thus, Defendant was on notice that the statements he gave at the proffer session were being used to form the basis of the charges in the Information.  Defendant, at that time, did not object to the use of these statements.

In addition, Defendant, at the May 15, 2006 hearing, waived his Fifth Amendment rights and testified as to the content of the proffer sessions. Specifically, at the May 15, 2006 hearing, Defendant asserted that he did not make the statements contained in the reports.  Therefore, Defendant raised the issue of the proffer sessions and the content contained therein.  Based on Defendant's failure to timely object to the use of the proffer statement and Defendant's testimony at the May 15, 2006 hearing raising the content of the proffer session, the court finds that Defendant has effectively waived his rights to object to the use of the proffer statements.

With respect to the content of the proffer sessions, the court need not examine these sessions in detail.  It is enough to note that during the proffer sessions, Defendant unequivocally confessed his involvement in the robbery of the Red Roof Inn on March 8, 1992.

---

[7](...continued)
additional contact with investigators where further investigation might implicate Defendant in the murder.

### 3.     **Assertions of Innocence as to the Charges of Hobbs Act Robbery and Criminal Conspiracy**

The remainder of Defendant's arguments fall under the assertion of innocence rubric of *United States v. Jones*. 336 F.3d at 252. As provided by *Jones*, before the court can allow Defendant to withdraw a guilty plea, the court must first determine whether Defendant asserts his innocence. *Id*. "Bald assertions of innocence, . . . are insufficient to permit a defendant to withdraw [his] guilty plea. 'Assertions of innocence must be buttressed by facts in the record that support a claimed defense.' " *Brown*, 250 F.3d at 818 (quoting *United States v. Salgado-Ocampo*, 159 F.3d 322, 326 (7th Cir. 1998)).

Defendant asserts his innocence with respect to the charges contained in his guilty plea; however, Defendant fails to provide any facts that support his assertion. Weighing strongly against Defendant's assertions are the testimonies and evidence presented at the May 15, 2006 and June 14, 2006 hearings. Specifically, both Mr. Muller and Mr. Thornton testified that Defendant had admitted his guilt with respect to involvement in the robbery of the Red Roof Inn. Moreover, Defendant's proffer statements clearly indicate Defendant's involvement in the robbery. Finally, at the guilty plea hearing, the Government read into the record the charges and the basis for the charges that Defendant was pleading guilty to. The court concluded the guilty plea hearing with the following series of questions:

| | |
|---|---|
| THE COURT: | Mr. Kenley, were you employed by the Red Roof Inn on March 8, 1992? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | And did you gain entrance to the office that contained the safe or where the money was kept? |
| THE DEFENDANT: | Yes, ma'am. |

16

| | |
|---|---|
| THE COURT: | And while there, did you participate in taking money that did not belong to you, belonged to the Red Roof Inn? |
| THE DEFENDANT: | Yes, ma'am. |

* * *

| | |
|---|---|
| THE COURT: | And you did this in conspiracy or in conjunction with one other or other persons? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | And did you, during the course of the investigation, attempt to dissuade your – is it ex-wife or – |
| MR. BEHE: | Ex-wife. |
| THE COURT: | – ex-wife to alter any testimony that she had previously supplied to investigators? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | Do you have any dispute with the facts as related by Mr. Behe? |
| THE DEFENDANT: | No, ma'am. |
| THE COURT: | You agree to all the facts? |
| THE DEFENDANT: | Yes, ma'am. |
| THE COURT: | Is it your desire to enter a plea of guilty to Count 1, 2, and 3 of this information? |
| THE DEFENDANT: | Yes. |

(Doc. 18, Guilty Plea Hr'g Tr. 19-21, Jan. 4, 2006.)

In addition to asserting his innocence, a defendant must " 'give sufficient reasons to explain why contradictory positions were taken before the district court and why permission should be given to withdraw the guilty plea.' " *Id*. (quoting *United States v. Jones*, 79 F.2d 317, 318 (3d Cir. 1992).  Defendant fails to

17

sufficiently explain why he has now decided to take a position that contradicts his previous statements to the court. While Defendant asserts that he was coerced into accepting the plea agreement, testimony by Mr. Muller and Mr. Thornton undercuts Defendant's assertions. Defendant relies on his contention that he only had two minutes to decide whether to take the plea agreement. However, testimony at the May 15, 2005 and June 14, 2006 hearings provides that plea negotiations had been ongoing since December 2005. Therefore, Defendant had sufficient time to consider whether he wished to enter into a plea agreement and what terms of a plea agreement would be acceptable. Moreover, Mr. Thornton's testimony and Defendant's statements at the guilty plea hearing (*see* Doc. 18, Guilty Plea Hr'g Tr. 4, Jan. 4, 2006), indicate that Mr. Thornton had gone over the plea agreement with Defendant in detail. Based upon the testimony, the court cannot accept that Defendant only had two minutes to decide whether to accept the plea agreement. Put simply, the court finds that Defendant entered into the plea agreement, as he indicated at the guilty plea hearing, because it was his desire to do so. (*See id*. at 21.)

The court finds Defendant's assertions that he has always wanted to go to trial to assert his innocence to be disingenuous. Clearly, Defendant was given an opportunity to go to trial; however, at the eleventh hour, Defendant decided to accept a plea agreement. Defendant fails to rectify these contradictory positions.

Finally, even if the court were to exclude the testimony of Mr. Thornton or Mr. Muller or the proffer statements, Defendant has produced nothing other than his bald assertions of innocence. This is simply not enough. *See Brown*, 250 F.3d at 818. Accordingly, the court will deny Defendant's motion to withdraw his guilty plea to the charges of Hobbs Act robbery and criminal conspiracy.

4.     **Assertions of Innocence as to the Charge of Witness Tampering**

With respect to the charge of witness tampering, the court notes that Defendant asserts his innocence.  However, Defendant does not deny making the recorded phone calls to Alisha Kenley from prison that contained requests that she change her testimony.  It is not disputed that Alisha Kenley told investigators that Defendant returned home covered in blood and with a bloody knife and confessed at the very least his involvement in the robbery to her.  Nor is it disputed that Defendant made telephone calls to Alisha Kenley from prison requesting her to change her testimony.  Those conversations were recorded; although the court has not had occasion to listen to these conversations, Defendant himself has admitted that the conversations occurred.  Defendant asserts that he was not guilty of witness tampering, although he provides no argument as to why the aforementioned actions do not constitute witness tampering.  As stated, Defendant must go beyond merely asserting innocence, he must support his claims with facts in the record.  *Id*. Defendant fails to do this.  Accordingly, the court will deny Defendant's motion to withdraw his guilty plea to the charge of witness tampering.[8]

---

[8]The court notes that not only do the recorded conversations between Defendant and Alisha Kenley support a charge of witness tampering, the recorded conversations also undermine Defendant's argument that he is innocent with respect to the Hobbs Act robbery and criminal conspiracy charges.

19

**IV.**          <u>**Conclusion**</u>

        Having concluded that Defendant has waived any argument with respect to the statutes of limitations and that Defendant has failed to adequately assert his innocence or sufficiently explain why he now takes a contradictory position the court will deny Defendant's motion.  An appropriate order will issue.


                                s/Sylvia H. Rambo
                                SYLVIA H. RAMBO
                                United States District Judge

Dated:  July 6, 2006.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


**UNITED STATES OF AMERICA**     :    **CRIMINAL NO. 1:CR-06-009**

            **v.**                       :

**JESSE KENLEY**                  :

## O R D E R

In accordance with the foregoing memorandum of law, **IT IS HEREBY ORDERED THAT** Defendant's motion to withdraw his guilty plea (Doc. 25) is **DENIED**.


                                 s/Sylvia H. Rambo
                                 SYLVIA H. RAMBO
                                 United States District Judge

Dated:  July 6, 2006.